**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **LISBETH SPILLER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 4:10CV2240 CAS(LMB)** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Lisbeth Spiller for Disability Insurance Benefits under Title II of the

Social Security Act and Supplemental Security Income benefits under Title XVI of the Act. The

cause was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the

Complaint. (Document Number 22). Defendant has filed a Brief in Support of the Answer.

(Doc. No. 26).

**Procedural History**

On July 29, 2002, plaintiff filed her application for benefits, claiming that she became

unable to work due to her disabling condition on June 15, 2000. (Tr. 71-73). This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated April 26, 2004. (Tr. 46, 58-61, 128-36).

- 1 -

On September 23, 2005, the Appeals Council of the Social Security Administration (SSA) remanded the case to the ALJ because the hearing recording could not be located and for further evaluation of plaintiff's past work. (Tr. 125-26). On October 26, 2006, after a hearing, an ALJ issued a new unfavorable decision. (Tr. 35-45). The Appeals Council denied plaintiff's request for review. (Tr. 3-5). Plaintiff filed an action in the United States District Court, which remanded the case to the Commissioner on February 6, 2009. (Tr. 214-36). On July 19, 2010, after a hearing, an ALJ issued an unfavorable decision. (Tr. 196-208). The Appeals Council declined plaintiff's request for review. (Tr. 187-88). Thus, the July 19, 2010 decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.  ALJ Hearing

Plaintiff's administrative hearing was held on May 26, 2010. (Tr. 416). Plaintiff was present and was represented by counsel. (Id.). Vocational expert Delores E. Gonzalez was also present. (Id.).

The ALJ clarified that plaintiff's alleged onset date of disability was June 15, 2000. (Tr. 417).

The ALJ examined plaintiff, who testified that she was forty-nine years of age and was divorced. (Tr. 419).

Plaintiff stated that, at the time of the hearing, she lived in a house with her son because she was unable to support herself financially. (Id.). Plaintiff testified that, since June 15, 2000, she had lived in two different apartments. (Tr. 420). Plaintiff stated that both apartments were on the second floor of the building and that she lived alone. (Tr. 420-21).

Plaintiff testified that she has three grand-children, who are aged 12, 12, and 1. (Tr. 421). Plaintiff stated that they are all her oldest son's children. (Id.). Plaintiff testified that her son and the children's mothers are separated and that the children live with their mothers. (Tr. 422). Plaintiff stated that she does not visit with the children often. (Id.). Plaintiff testified that she last saw her grand-children about one month prior to the hearing. (Tr. 423). Plaintiff stated that her son has visitation rights, and that she sees the children when they visit their father. (Id.).

Plaintiff stated that she was five-feet, five-inches tall, and weighed 142 pounds. (Id.).

Plaintiff testified that she had a twelfth-grade education. (Id.). Plaintiff stated that she was able to read as long as she wore her reading glasses. (Tr. 424). Plaintiff testified that she was capable of performing simple arithmetic. (Id.).

Plaintiff stated that she served seven months in jail for being an accomplice to a theft. (Id.). Plaintiff testified that she pleaded guilty to the charge. (Tr. 425). Plaintiff stated that a credit card device was used to obtain merchandise. (Id.).

Plaintiff testified that she was not working at the time of the hearing and that she last worked in April of 2006. (Id.). Plaintiff stated that she did not receive food stamps. (Id.). Plaintiff testified that her application for food stamps was denied two months prior to the hearing because she would not look for work due to her alleged disability. (Id.). Plaintiff stated that she has never filed a workers' compensation claim. (Id.). Plaintiff testified that she has not received unemployment benefits since her alleged onset of disability. (Id.). Plaintiff stated that she does not receive Medicaid benefits. (Tr. 426). Plaintiff testified that her children's father and her son help her financially. (Tr. 426).

Plaintiff stated that she worked full-time as an assistant manager at Dollar Tree from

February to June 2000.  (Id.).  Plaintiff testified that she assisted customers and supervised employees at this position.  (Tr. 429).  Plaintiff stated that she supervised about six employees and that she had the ability to hire and fire.  (Id.).  Plaintiff testified that she did inventories and closed the store.  (Id.).

Plaintiff testified that she did telemarketing work for three days.  (Tr. 426).

Plaintiff stated that she worked for Walgreens as a sales associate from March 1984 to June 1998.  (Id.).

Plaintiff testified that she also worked in housekeeping and at the front desk at Motel 6.  (Tr. 427).  Plaintiff stated that this was a part-time position.  (Tr. 428).

Plaintiff testified that she has worked after her alleged onset date of June 15, 2000.  (Tr. 429).  Plaintiff stated that she has worked at the Family Dollar, Dollar Tree, and Motel 6 since this time.  (Id.).  Plaintiff testified that she did not work full-time at these positions because full-time work was not available.  (Tr. 429-30).

Plaintiff testified that she is unable to work full-time because she suffers from back pain and experiences pain when she stands in one position for a long period of time.  (Tr. 432).  Plaintiff stated that she was diagnosed with scoliosis[1] in 2002, which is the cause of her back pain.  (Id.).

Plaintiff testified that she also suffers from depression.  (Id.).  Plaintiff stated that she saw psychiatrist Allen Morris in 2010.  (Tr. 433).  Plaintiff testified that she only saw Dr. Morris on this one occasion, at the request of the SSA.  (Id.).  Plaintiff stated that she has not sought any

---

[1]Abnormal lateral and rotational curvature of the vertebral column.  See Stedman's Medical Dictionary, 1734 (28th Ed. 2006).

psychiatric treatment from any other doctor.  (Id.).  Plaintiff testified that a doctor at John C. Murphy prescribed Citalopram[2] for depression.  (Id.).  Plaintiff stated that this was a regular doctor and not a psychiatrist or psychologist.  (Tr. 434).  Plaintiff testified that this doctor did not refer her to a psychiatrist or psychologist.  (Id.).

Plaintiff stated that she experiences leg pain and severe back pain as a result of the scoliosis.  (Id.).  Plaintiff testified that she takes Gabapentin,[3] Naproxen,[4] Citalopram, and Cyclobenzaprine.[5]  (Id.).  Plaintiff stated that these medications help with the pain and have a sedative effect.  (Id.).

Plaintiff testified that she was diagnosed with PTSD[6] by Dr. Michael Armour due to her mother's death when she was ten.  (Tr. 435).  Plaintiff stated that her mother's death still bothers her because she never got to know her mother.  (Id.).  Plaintiff testified that no one has ever recommended that she receive counseling.  (Id.).

Plaintiff stated that she smokes six to eight cigarettes a day.  (Id.).

---

[2]Citalopram is an antidepressant indicated for the treatment of depression.  See Physician's Desk Reference (PDR), 1160-61 (63rd Ed. 2009).

[3]Gabapentin is indicated for the treatment of seizures and nerve pain.  See WebMD, http://www.webmd.com/drugs (last visited October 19, 2011).

[4]Naproxen is a nonsteroidal anti-inflammatory drug indicated for the treatment of mild to moderate pain.  See PDR at 2632-33.

[5]Cyclobenzaprine is indicated for the treatment of muscle pain and spasms.  See PDR at 966.

[6]Posttraumatic stress disorder ("PTSD") is the development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently reexperiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria.  Stedman's at 570.

Plaintiff testified that, in 2002, she regularly jogged in a park. (Tr. 436). Plaintiff stated that she no longer exercised at the time of the hearing. (Id.). Plaintiff testified that she also went grocery shopping, cleaned, did laundry, and ironed in 2002. (Id.). Plaintiff stated that she lived alone in an apartment at that time. (Id.). Plaintiff testified that the laundry facilities were located in a different building. (Tr. 437).

Plaintiff stated that she did not drink alcohol at the time of the hearing. (Id.). Plaintiff testified that she quit drinking in 2000. (Id.). Plaintiff stated that she used to be a light drinker and that she drank wine and beer. (Id.). Plaintiff testified that she used cocaine in the 1980s. (Tr. 438).

Plaintiff stated that she did not have a driver's license and that she did not drive. (Tr. 438). Plaintiff testified that her children's father drove her to the hearing. (Id.). Plaintiff stated that her children's father helps her financially. (Id.).

Plaintiff testified that she lived with her thirty-two-year-old son and that her son works almost every day from 9:00 a.m. to 9:00 p.m. (Id.). Plaintiff stated that she does little work around the house. (Tr. 439). Plaintiff testified that she does light cooking. (Id.). Plaintiff stated that she fries chicken. (Id.). Plaintiff testified that she washes dishes by hand because her son does not have a dishwasher. (Id.). Plaintiff stated that her son's house does not have a washer and dryer. (Tr. 440). Plaintiff testified that her son takes the laundry to his child's mother's house. (Id.). Plaintiff stated that her son's house is one-story with an unfinished basement. (Id.). Plaintiff testified that she has no need to go in the basement. (Id.). Plaintiff stated that she stopped doing laundry when she moved in with her son. (Id.). Plaintiff testified that she does not do any yard work. (Tr. 441). Plaintiff stated that her son goes grocery shopping. (Id.). Plaintiff

testified that she shops for groceries about once a month and that her son takes her to the store. (Id.).

Plaintiff stated that she does not have any hobbies. (Id.). Plaintiff testified that she last took a trip more than 100 miles from her home when her father died in 2005. (Id.). Plaintiff stated that her son drove on this trip. (Id.).

Plaintiff testified that, at the time of the hearing, she was able to walk fifteen to twenty minutes. (Tr. 442). Plaintiff stated that in 2000, she was able to walk thirty to forty-five minutes. (Id.). Plaintiff testified that she was able to stand about thirty minutes at the time of the hearing and an hour to an hour-and-a-half in 2000. (Id.). Plaintiff stated that she was able to sit one hour at the time of the hearing and three hours in 2000. (Id.). Plaintiff testified that she was able to lift no more than ten pounds at the time of the hearing, and ten to fifteen pounds in 2000. (Id.). Plaintiff stated that she is unable to lift her grandson, who weighs nineteen pounds. (Tr. 443).

Plaintiff testified that she experiences pain in her arms, which became severe two to three years prior to the hearing. (Tr. 444). Plaintiff stated that she is unable to lift anything over her head. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that her medications have a sedating effect. (Id.). Plaintiff stated that does not feel normal and feels like she cannot do anything when she takes her medications. (Id.).

Plaintiff testified that, at the time of the hearing, she took Gabapentin and Naproxen and that she previously took Citalopram and Cyclobenzaprine. (Id.).

Plaintiff stated that she had been physically abused by a family member as an adult. (Tr. 445). Plaintiff testified that she reported this to Dr. Armour. (Id.). Plaintiff stated that she has

never spoken with anyone about this abuse. (Id.).

The ALJ then examined the vocational expert, Ms. Gonzalez, who testified that plaintiff's work as an assistant manager was classified as light and semiskilled; her retail sales clerk position was classified as light semiskilled; her housekeeper work was light and unskilled; and her front desk clerk work was light and semiskilled. (Id.). Ms. Gonzalez stated that plaintiff's management skills and customer service skills could be used in other jobs. (Tr. 448).

The ALJ asked Ms. Gonzalez to assume an individual who was capable of performing light work with the following exceptions: occasionally climb stairs and ramps; never climb ropes, ladders, scaffolds; occasionally stoop, kneel, and crouch; and never crawl. (Id.). Mr. Gonzalez testified that such an individual could perform all of plaintiff's past work. (Id.).

The ALJ next asked Ms. Gonzalez to assume the same limitations with the addition of a sit/stand option at the work site with the ability to change positions frequently. (Id.). Ms. Gonzalez testified that the individual could perform plaintiff's past work as an assistant manager and that there were 365,460 such positions nationally and 4000 in Missouri. (Tr. 448-49). Ms. Gonzalez stated that the individual could also perform work as a cashier, and that 3,479,390 such positions exist nationally and 8180 in Missouri. (Id.).

The ALJ then asked Ms. Gonzalez to assume an individual with the same limitations as the previous hypothetical and the following additional limitations: can stand/walk two hours out of eight; can sit six hours out of eight; and requires a sit/stand option. (Tr. 449). Ms. Gonzalez testified that the individual would be unable to perform the work he described with regard to the second hypothetical. (Id.). Ms. Gonzalez testified that the individual could perform work as an order clerk, which is sedentary and unskilled (264,520 positions nationally, 7130 in Missouri); and

surveillance system monitor, which is sedentary and unskilled (85,440 nationally, 2020 in Missouri). (Tr. 450).

Ms. Gonzalez testified that an additional limitation of never reaching overhead would not impact the jobs she described with regard to the third hypothetical. (Id.).

The ALJ next asked Ms. Gonzalez to assume an additional limitation of only occasional handling, fingering, and feeling. (Id.). Ms. Gonzalez testified that this would impact the order clerk but not the surveillance system monitor. (Id.). Ms. Gonzalez stated that the individual could also perform work as a call out operator, which is sedentary and unskilled (67,400 positions nationally, 1190 in Missouri). (Tr. 450-51).

The ALJ then asked Ms. Gonzalez to assume the same limitations as hypothetical five with the additional limitations of understanding, remembering, and carrying out at least simple instructions, detailed tasks, demonstrate adequate judgment to make simple work-related decisions, adapt to routine simple work changes, perform repetitive work according to set procedure, sequence, and pace. (Tr. 451). Ms. Gonzalez testified that this would not impact the jobs she described with regard to hypothetical five. (Id.).

Plaintiff's attorney then examined Ms. Gonzalez. (Id.). Plaintiff's attorney asked Ms. Gonzales to assume the limitations found by Dr. Morris. (Id.). Ms. Gonzalez testified that an individual with such limitations would be unable to perform plaintiff's past work or other work. (Tr. 452).

**B.     Relevant Medical Records**

The record reveals that plaintiff presented to Matthew J. Miriani, D.O. with complaints of

back pain on March 4, 1992. (Tr. 167). A physical examination revealed marked scoliosis in the thoracic spine[7] with curvature to the right with obvious deformity in the thoracic musculature. (Id.). Plaintiff stood with her shoulders drooped to the left and had uneven leg length secondary to this. (Id.). Dr. Miriani diagnosed plaintiff with scoliosis. (Id.). He ordered x-rays and an orthopedic consultation. (Id.). Plaintiff saw Dr. Miriani for low back pain on September 15, 1993, September 15, 1997, and May 4, 1998. (Tr. 167, 166).

Plaintiff underwent x-rays of the thoracic spine on September 16, 2002, which revealed moderate thoracic curve convex to the right side, centered at T-9 vertebra. (Tr. 162).

Plaintiff presented to Sarwath Bhattacharya, M.D. for an internal medicine examination on September 16, 2002. (Tr. 159-61). Plaintiff complained of back pain that had been worsening with age. (Tr. 159). Plaintiff reported that she was able to walk three blocks, stand three hours, sit for two to three hours, lift ten pounds, and bend down. (Id.). Upon examination, plaintiff's gait was within normal limits, plaintiff was able to walk on her heels and toes and touch her toes, she had no difficulty getting on and off the examination table, and straight leg raises were within normal limits. (Tr. 160). Squatting was asymmetric with the upper torso leaning to the left and the right knee was abducted when she squatted fully. (Id.). Plaintiff had a kyphoscoliotic[8] deformity starting between the upper scapular area of the back ending in the upper lumbar area, with some crowding of ribs in

---

[7]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[8]Kyphoscoliosis is an abnormal front to back curvature of the vertebral column. See Stedman's at 1036.

the chondro-lateral side, and some tenderness in the right side of the thoracic and L-spine areas. (Id.). Dr. Bhattacharya's impression was marked kypho-scoliosis of the thoracic and lumbar spine giving her back pain constantly radiating to the upper lumbar spine area. (Tr. 161). Dr. Bhattacharya noted that plaintiff also had pain in the knees off and on, which was progressively increasing with age. (Id.). Dr. Bhattacharya stated that there were no radicular changes at that time. (Id.).

Plaintiff presented to the St. Louis County Health Center on May 29, 2003, with complaints of lower back pain. (Tr. 120). Physical examination revealed pronounced thoracic scoliosis. (Id.). Plaintiff's lumbar spine forward bending was measured at forty-five degrees and her extension was measured at five degrees. (Id.). Plaintiff was referred to physical therapy. (Id.). An office note dated July 17, 2003, indicated that physical therapy was scheduled for July 21, 2003. (Tr. 119).

Plaintiff presented to the John C. Murphy Health Center on September 22, 2006, with complaints of depression, lack of sleep, and back pain. (Tr. 13). Upon examination, kyphoscoliosis was noted. (Tr. 14). Plaintiff was diagnosed with idiopathic scoliosis[9] and kyphoscoliosis. (Id.). Esther F. Adade, M.D. prescribed Motrin, Flexeril, and Citalopram. (Id.).

Plaintiff presented to the John C. Murphy Health Center on December 27, 2006, for a follow-up. (Tr. 379-80). Plaintiff complained of depression, difficulty sleeping, and back pain. (Tr. 379). Plaintiff indicated that the Citalopram did not help. (Id.). Plaintiff's neuropsychiatric examination revealed a depressed mood, with appropriate judgment and insight, no psychotic thoughts, no attention deficit, and no impairment in abstract reasoning, or memory. (Tr. 379-80). Patricia S. Inman, M.D. diagnosed plaintiff with depressive disorder and prescribed Gabapentin. (Tr. 380).

Plaintiff saw Dr. Inman on March 5, 2007, at which time she complained of back pain and

[9]Scoliosis of unknown cause. See Stedman's at 1734.

depression. (Tr. 377). Plaintiff reported that her back pain was better controlled with regular medication and that she was sleeping better. (Id.). Upon examination, Dr. Inman noted persistent lumbar spasm, with less tenderness. (Id.). Dr. Inman's assessment was idiopathic scoliosis and kyphoscoliosis. (Id.). She prescribed Flexeril[10] and Gabapentin. (Tr. 377-78).

Plaintiff underwent a scoliosis series on March 15, 2007, which revealed a marked right thoracic curve of fifty degrees. (Tr. 395).

Plaintiff presented to St. Louis Connect Care on April 18, 2007, with complaints of low back pain. (Tr. 10). Plaintiff was diagnosed with scoliosis. (Id.).

Plaintiff saw Dr. Inman on June 4, 2007, with complaints of seasonal allergies and worsening back pain due to scoliosis. (Tr. 374). Dr. Inman prescribed Gabapentin for plaintiff's back pain and mood. (Tr. 375).

Plaintiff presented to Dr. Dirk H. Alander at Saint Louis University Hospital Orthopaedic Surgery on June 8, 2007, for an evaluation regarding scoliosis and low back pain with radicular symptoms to her bilateral lower extremities. (Tr. 410-11). Upon examination, plaintiff had some tenderness to palpitation of the paraspinal musculature of the lumbar spine. (Tr. 410). Plaintiff had full strength in all major muscle groups to her bilateral lower extremities, negative straight leg raise bilaterally, no pain with range of motion of her hips, and was able to ambulate without difficulty. (Id.). Dr. Alander diagnosed plaintiff with adult onset scoliosis and likely lumbar spinal stenosis.[11] (Tr. 411). A CT scan was ordered. (Id.).

In a letter dated July 20, 2007, Dr. Inman stated that plaintiff has severe scoliosis and is unable

---

[10]Flexeril is a muscle relaxant indicated for the treatment of muscle pain and spasm. See WebMD, http://www.webmd.com/drugs (last visited October 19, 2011).

[11]Narrowing of the spinal canal. See Stedman's at 1832.

to work at this time. (Tr. 7). Dr. Inman stated that plaintiff was in the process of evaluation by an orthopedist. (Id.). An office note dated July 20, 2007, indicated that plaintiff had requested that Dr. Inman write the letter. (Tr. 373).

On July 25, 2007, Dr. Inman completed a Physician's Statement for Disabled License Plates/Placard indicating that plaintiff was permanently disabled. (Tr. 8).

Plaintiff saw Maria Bitzer, FNP at John C. Murphy Health Center on November 6, 2007, with complaints of back pain, depression, and seasonal allergies. (Tr. 370-72). Plaintiff described her back pain as a dull ache, stabbing, piercing, and shooting, and indicated that the pain radiates to the lateral aspect of her right leg and the lateral aspect of her left leg. (Tr. 370). Plaintiff was referred to St. Louis Connect Care Orthopedics. (Tr. 372).

In an office note dated February 29, 2008, Dr. Alander indicated that plaintiff had undergone a CT scan, which revealed a "little bit of stenosis, but nothing significant, certainly nothing that would warrant any operative intervention." (Tr. 389). Dr. Alander stated that plaintiff complained of back pain but did not report leg symptoms. (Id.).

Plaintiff saw Ms. Bitzer on April 29, 2008, with complaints of back pain and depression. (Tr. 364-67). It was noted that plaintiff had an appointment with Dr. Place in May 2008. (Tr. 365).

Plaintiff presented to Dr. Howard Place at Saint Louis University Hospital Orthopaedic Surgery on May 5, 2008, for an evaluation of her kyphoscoliosis. (Tr. 404-05). Plaintiff complained of back pain that had been present for up to fifteen years, which was increasingly limiting her activities. (Tr. 404). Plaintiff denied any lower extremity symptoms. (Id.). Plaintiff reported that she was able to walk half a mile without stopping for pain. (Id.). Plaintiff indicated that she was taking ibuprofen, which helped with her pain. (Id.). Upon examination, plaintiff had a noted right-

sided thoracic rib hump and slight prominence of her left flank.  (Id.).  Plaintiff had full strength in all muscle groups of her lower extremity.  (Id.).  Dr. Place's impression was kyphoscoliosis.  (Id.). Plaintiff was adamant that she was not interested in surgery and indicated that she was interested in disability.  (Id.).  Dr. Place stated that plaintiff would not qualify for disability at that time.  (Id.).

Plaintiff saw Ms. Bitzer on June 3, 2008, with complaints of depression and insomnia.  (Tr. 360-62).  Plaintiff reported crying spells, feelings of sadness, nervousness, and fatigue.  (Tr. 360). Plaintiff was diagnosed with depressive disorder.  (Tr. 362).  Citalopram was prescribed.  (Id.).

Plaintiff saw Mary Fran Digregorio, APN, at John C. Murphy Health Center on November 20, 2008, with complaints of depression, back pain, and insomnia.  (Tr. 351).

Plaintiff saw Ms. Digregorio on April 21, 2009, with complaints of pain in both shoulders, back pain, depression, and insomnia.  (Tr. 348).

Plaintiff presented to Michael T. Armour, Ph.D., Clinical Psychology, for a psychological evaluation at the request of the state agency on October 14, 2009.  (Tr. 321-32).  Plaintiff reported that she had been physically abused as an adult by the father of her children.  (Tr. 322).  Plaintiff indicated that she experienced nightmares about the abuse and intrusive thoughts but denied avoiding stimuli or reminders of violence.  (Id.).  Dr. Armour administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), which indicated that plaintiff responded to test questions in a consistent manner but that she also tended to respond "yes" to more items.  (Tr. 323).  This tendency was not so severe as to render her profile invalid.  (Id.).  Dr. Armour noted that plaintiff's results may reflect long-standing problems or an attempt to malinger or "fake bad."  (Tr. 324).  Dr. Armour stated that authors interpret plaintiff's results as "highly indicative of exaggeration of physical complaints."  (Id.).  Dr. Armour stated that testing revealed that plaintiff was anxious, agitated, and

tense, and likely has problems with poor concentration, sleep disturbance, confused thinking, and somatic complaints. (Tr. 324). Dr. Armour diagnosed plaintiff with major depressive disorder,[12] recurrent, moderate; posttraumatic stress disorder, chronic; physical abuse as an adult; attention deficit hyperactivity disorder inattentive type;[13] and pain disorder[14] associated with both psychological factors and a general medical condition. (Tr. 325). Dr. Armour assessed a GAF[15] score of 45 to 50.[16] (Id.). Dr. Armour expressed the opinion that plaintiff had mild to occasionally moderate impairment in the ability to understand and remember instructions; moderate impairment in the ability to sustain concentration and persistence in tasks; and moderate impairment in the ability to interact socially and adapt to her environment. (Tr. 325-26).

Dr. Armour completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (Tr. 330-32). Dr. Armour expressed the opinion that plaintiff had mild restrictions in her ability to make judgments on simple work-related decisions, and interact appropriately with co-

---

[12]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Stedman's at 515.

[13]A behavioral disorder manifested by developmentally inappropriate degrees of inattentiveness, impulsiveness and hyperactivity. Stedman's at 568.

[14]A somatoform disorder in which pain is the predominant presenting symptom. Stedman's at 570.

[15]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[16]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32. A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 32.

workers; and moderate restrictions in her ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, interact appropriately with supervisors, and respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 330-31).

Plaintiff saw Ms. Digregorio on October 20, 2009, with complaints of joint pain, back pain, depression, and arm pain. (Tr. 312). Ms. Digregorio diagnosed plaintiff with idiopathic scoliosis and kyphoscoliosis, possible scleroderma,[17] depressive disorder, and allergies. (Tr. 313). Plaintiff was prescribed Flexeril, Naproxen, Gabapentin, and Citalopram. (Id.).

Plaintiff saw Alan Morris, M.D. on October 29, 2009, for an orthopedic evaluation. (Tr. 333-35). Plaintiff complained of back pain in the midline lumbar area and mid thoracic regions. (Tr. 334). Plaintiff indicated that the pain occasionally radiated to both ankles, which usually increased when she stood for long periods. (Id.). Plaintiff was able to sit up to sixty minutes, stand thirty minutes, walk ten minutes, and lift eight pounds. (Id.). Plaintiff was able to dress, take care of personal hygiene, do light housekeeping, and cook. (Id.). Dr. Morris noted that plaintiff was able to walk fifty feet without a cane, and that she had a slight limp on the left leg as she walks. (Id.). As plaintiff stood, she was tilted toward her left side because of a prominent right thoracic scoliosis with a prominent rib hump. (Id.). Plaintiff was able to walk on the heels and toes and do a tandem gait; squat to ninety degrees of knee flexion; dress, undress, rise from a squatting position, rise from a chair, and get on and off the examining table independently. (Id.). Plaintiff had a slight limitation of motion of the shoulders associated with pain in the right shoulder. (Tr. 335). Dr. Morris diagnosed

---

[17]A connective tissue disease that involves changes in the skin. <u>Stedman's</u> at 1732.

plaintiff with thoracolumbar[18] scoliosis with back pain.  (Id.).

Dr. Morris completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical).  (Tr. 336-41).  Dr. Morris expressed the opinion that plaintiff could occasionally lift up to ten pounds and could never lift more than ten pounds; plaintiff could never carry any amount of weight; sit sixty minutes; stand thirty minutes; and walk ten minutes at one time; sit a total of four hours in an eight-hour workday, and stand and walk a total of one hour in an eight-hour workday.  (Tr. 336-37).  Dr. Morris found that plaintiff could never reach or push/pull with either hand; and could occasionally handle, finger, and feel.  (Tr. 338).  Dr. Morris found that plaintiff could never climb ladders or scaffolds, crouch, or crawl; and could occasionally climb stairs and ramps, balance, stoop, and kneel.  (Tr. 339).  Finally, Dr. Morris indicated that plaintiff could never be exposed to unprotected heights, or operate a vehicle; and could occasionally be exposed to moving mechanical parts.  (Tr. 340).

Plaintiff saw Ms. Digregorio on November 3, 2009, with complaints of pain in her right arm and depression.  (Tr. 307).  Plaintiff indicated that the onset of pain in her arm had been gradual and been occurring in a persistent pattern for months.  (Id.).  Plaintiff was diagnosed with arm and shoulder pain, and depressive disorder.  (Tr. 308).

Plaintiff saw William Feldner, D.O. at John C. Murphy Health Center on November 12, 2009, with complaints of elbow pain.  (Tr. 305).  Dr. Feldner diagnosed plaintiff with epicondylitis.[19]  (Tr. 306).  He advised plaintiff to use ice and rest.  (Id.).

---

[18]Relating to the thoracic and lumbar portions of the vertebral column.  Stedman's at 1982.

[19]Epicondylitis, or tennis elbow, is the inflammation or pain on the outside of the upper arm near the elbow.  Stedman's at 653.

Plaintiff saw Ms. Digregorio on January 19, 2010, with complaints of scoliosis and a rash on her right ankle. (Tr. 303). Plaintiff was diagnosed with possible scleroderma and idiopathic scoliosis and kyphoscoliosis. (Tr. 304).

Plaintiff saw Asha Kodwani, M.D. at John C. Murphy Health Center on April 13, 2010. (Tr. 295). Dr. Kodwani noted that plaintiff had fallen on November 5, 2008, and that she suffered a small avulsion fracture of the tip of the left nasal bone. (Id.). Dr. Kodwani also noted scoliosis, mood swings, depression, anxiety, numbness/dizziness, and headache. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through June 30, 2008.

2.     The claimant has not engaged in substantial gainful activity for much of the period since June 15, 2000, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     From June 15, 2000 until September 22, 2006, the claimant had one severe impairment, scoliosis; beginning on September 22, 2006, the claimant also had major depression, post-traumatic stress disorder, and right shoulder and hand pain (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she requires a sit stand option with the ability to change position frequently, she never climb ropes, ladders, or scaffolds and crawl; but could occasionally climb stairs and ramps, stoop, kneel, and crouch. Beginning on September 22, 2006, the claimant was further limited in that she could never reach overhead and was limited to occasional handling, fingering, and feeling;

she retains the ability to understand, remember, and carry out simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple work-related decisions; and perform repetitive work according to set procedures, sequence, or pace.

6.      The claimant is capable of performing past relevant work as an assistant manager or cashier. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2000, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 199-208).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on July 29, 2002, claimant is not disabled under section 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on July 29, 2002, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 208).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits

must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

## B.  The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work

activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must

be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe

impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff also contends that the hypothetical question posed to the vocational expert was erroneous. The undersigned will discuss plaintiff's claims in turn.

### 1.    Residual Functional Capacity

Plaintiff argues that the ALJ erred in concluding that she retained the ability to perform a limited range of light work without identifying supporting medical evidence.  Plaintiff also argues that, in determining her RFC, the ALJ failed to properly evaluate the medical opinion evidence.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence.  See Lauer, 245 F.3d at 704.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she requires a sit stand option with the ability to change position frequently, she never climb ropes, ladders, or scaffolds and crawl; but could occasionally climb stairs and ramps, stoop, kneel, and crouch. Beginning on September 22, 2006, the claimant was further limited in that she could never reach overhead and was limited to occasional handling, fingering, and feeling; she retains the ability to understand, remember, and carry out simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple work-related decisions; and perform repetitive work according to set procedures, sequence, or pace.

(Tr. 201).

Plaintiff contends that residual functional capacity ("RFC") is a medical determination which requires some medical evidence. While the formulation of RFC is a medical question, Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000), it is based on all the relevant, credible evidence of record including the medical records, observations of treating physicians and others, and an individual's own description of limitations. See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003).

In support of his RFC determination, the ALJ discussed plaintiff's credibility and found that plaintiff's subjective complaints were not credible, a finding that plaintiff does not challenge. (Tr. 202). Significantly, the ALJ noted that although plaintiff alleges disability beginning June 15, 2000, plaintiff was substantially gainfully employed from July 2004 through May 2005. (Tr. 202). Further, plaintiff testified that she did not work full-time after her alleged onset date only because full-time work was not available. (Tr. 428). The ALJ properly found that plaintiff's ability to work long after her alleged onset of disability detracted from her credibility. See Naber v. Shalala, 22 F.3d 186, 189

(8th Cir. 1994) (ability to perform work during relevant time period supported ALJ's conclusion claimant could perform light work despite pain); Medhaug v. Astrue, 578 F.3d 805, 816 (8th Cir. 2009 (it was proper for ALJ to consider employment positions maintained after alleged onset of disability).

With respect to the medical evidence, the ALJ provided a thorough summary of the medical evidence and found that the evidence failed to support plaintiff's allegations of a disabling impairment. (Tr. 202). The ALJ noted that plaintiff never presented for treatment in acute distress; her gait was normal, requiring no assistive devices; she was able to walk heel-to-toe; she had no muscle atrophy, sensory loss, or weakness; she had full range of motion; her straight leg rasing was normal; and she was not experiencing any incontinence. (Id.). The ALJ stated that it is reasonable to conclude that an individual experiencing the degree of pain alleged by plaintiff would have some sensory, muscular, or orthopedic limitations secondary to that painful condition. (Id.). The ALJ stated that the lack of medical findings undermines plaintiff's credibility.

Plaintiff argues that the ALJ erred in evaluating the medical opinion evidence. In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20

C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Plaintiff first contends that the ALJ erred in relying on the opinion of Dr. Place that plaintiff was not disabled. Plaintiff saw Dr. Place at Saint Louis University Hospital Orthopaedic Surgery on May 5, 2008. (Tr. 404-05). Plaintiff complained of back pain but denied any lower extremity symptoms. (Tr. 404). Plaintiff reported that she was able to walk half a mile without stopping for pain. (Id.). Plaintiff indicated that she was taking ibuprofen, which helped with her pain. (Id.). Upon examination, plaintiff had full strength in all muscle groups of her lower extremity. (Id.). Dr. Place's impression was kyphoscoliosis. (Id.). Plaintiff was adamant that she was not interested in surgery and indicated that she was interested in disability. (Id.). Dr. Place expressed the opinion that plaintiff did not qualify for disability at that time. (Id.).

The ALJ stated that he was assigning "great weight" to the opinion of Dr. Place. (Tr. 205). The ALJ noted that Dr. Place was an adult scoliosis specialist. (Id.). The ALJ stated that, like the opinion of Dr. Inman, the opinion of Dr. Place is not entitled to special weight on the issue of disability. (Id.). The ALJ stated that, unlike the opinion of Dr. Inman, the opinion of Dr. Place is supported by years of imaging studies and treatment records from St. Louis University Medical School doctors. (Id.). The ALJ also pointed out that Dr. Place was a specialist in adult scoliosis and was therefore most qualified to provide an opinion regarding plaintiff's functional limitations. (Id.).

The undersigned finds that the ALJ properly evaluated the opinion of Dr. Place. The ALJ

acknowledged that Dr. Place's statement that plaintiff was not disabled was not entitled to special weight. See Samons v. Astrue, 497 F.3d 813, 819 (8th Cir. 2007) ("statement that [claimant] could not work was a conclusory opinion on the ultimate issue of disability, which is a question for the SSA, not a physician"); SSR 96-5p. The ALJ, however, accorded great weight to the overall opinion of Dr. Place. Dr. Place is an orthopaedic surgeon and specialized in adult scoliosis. Dr. Place performed an examination and noted that plaintiff had full strength in all muscle groups of her lower extremity. (Tr. 404-05). Dr. Place noted that plaintiff was not interested in surgery and indicated that she was instead interested in receiving disability benefits. (Id.). The fact that plaintiff expressed her interest in receiving disability benefits rather than treatment detracts from plaintiff's credibility.

Although Dr. Place's opinion that plaintiff was not disabled was not entitled to special weight, Dr. Place did not simply provide a conclusory statement that plaintiff was not disabled. The ALJ accurately distinguished Dr. Place's opinion from the statement of Dr. Inman. (Tr. 7). Dr. Inman simply authored a brief letter, at plaintiff's request, indicating that plaintiff was unable to work. (Id.). The ALJ properly found that this statement was entitled to little weight. (Tr. 205). Dr. Place rendered his opinion after examining plaintiff, reporting plaintiff's statements that detracted from her credibility, and reviewing plaintiff's other records, including objective testing. A physician's opinion on the issue of disability, combined with other medical information, may assist an ALJ determining whether a claimant is disabled. See Samons, 497 F.3d at 819. As such, the ALJ properly considered Dr. Place's opinion.

Plaintiff next contends that the ALJ erred in evaluating the statements of Dr. Alander. The ALJ stated that he was assigning great weight to the opinion of Dr. Alander. (Tr. 205). The ALJ noted that Dr. Alander concluded that plaintiff did not need spinal surgery. (Id.). Plaintiff contends

that the fact that plaintiff does not require surgery does not indicate that plaintiff is not disabled and does not support the ALJ's residual functional capacity determination.

In an office visit note dated February 29, 2008, Dr. Alander indicated that plaintiff had undergone a CT scan, which revealed a "little bit of stenosis, but nothing significant, certainly nothing that would warrant any operative intervention." (Tr. 389). Dr. Alander noted that plaintiff complained of back pain but did not report leg symptoms. (Id.). Dr. Alander had previously seen plaintiff for a scoliosis evaluation on June 8, 2007. (Tr. 410-11). Upon examination, plaintiff had some tenderness to palpitation of the paraspinal musculature of the lumbar spine, but had full strength in all major muscle groups to her bilateral lower extremities, negative straight leg raise bilaterally, no pain with range of motion of her hips, and was able to ambulate without difficulty. (Id.). Dr. Alander diagnosed plaintiff with adult onset scoliosis and likely lumbar spinal stenosis. (Tr. 411). Dr. Alander ordered the CT scan at that time. (Id.).

The ALJ properly evaluated the opinion of Dr. Alander. Although plaintiff accurately points out that the fact that plaintiff does not require surgery is not synonymous with a finding that she is not disabled, Dr. Alander did not simply express the opinion that surgery was not required. Dr. Alander examined plaintiff and noted minimal findings and reviewed a CT scan, which revealed a "little bit of stenosis, but nothing significant." (Tr. 389). As the ALJ pointed out, Dr. Alander is an spinal and reconstructive surgeon at St. Louis University Medical School. (Tr. 203). As such, the ALJ properly assigned great weight to the findings of Dr. Alander, which were based on examinations and objective testing.

Plaintiff also contends that the ALJ erred in failing to assign significant weight to the opinion of consulting physician Dr. Morris. Plaintiff saw Dr. Morris on October 29, 2009 for an orthopedic

evaluation. (Tr. 333-35). Plaintiff reported that she was able to sit up to sixty minutes, stand thirty minutes, walk ten minutes, and lift eight pounds. (Tr. 334). Dr. Morris noted that plaintiff was able to walk fifty feet without a cane, and that she had a slight limp on the left leg as she walks. (Id.). Plaintiff was able to walk on the heels and toes and do a tandem gait; squat to ninety degrees of knee flexion; dress, undress, rise from a squatting position, rise from a chair, and get on and off the examining table independently. (Id.). Plaintiff had a slight limitation of motion of the shoulders associated with pain in the right shoulder. (Tr. 335). Dr. Morris diagnosed plaintiff with thoracolumbar scoliosis with back pain. (Id.). Dr. Morris completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (Tr. 336-41). Dr. Morris expressed the opinion that plaintiff could occasionally lift up to ten pounds and could never lift more than ten pounds; plaintiff could never carry any amount of weight; sit sixty minutes; stand thirty minutes; and walk ten minutes at one time; sit a total of four hours in an eight-hour workday; and stand and walk a total of one hour in an eight-hour workday. (Tr. 336-37).

The ALJ stated that he was not giving significant weight to Dr. Morris' RFC assessment as there is no evidence in the record supporting a four-hour limitation to sitting or plaintiff's lifting limitations, aside from her own unreliable complaints. (Tr. 205).

The ALJ did not err in failing to assign significant weight to Dr. Morris' opinion. Dr. Morris was a one-time consulting physician. Dr. Morris' findings on examination did not reveal any significant abnormalities. Notably, plaintiff was able to walk fifty feet without a cane, walk on the heels and toes and do a tandem gait, squat to ninety degrees of knee flexion, dress, undress, rise from a squatting position, rise from a chair, and get on and off the examining table independently. (Id.). Dr. Morris' RFC assessment appeared to be based solely on plaintiff's subjective complaints. As

such, the ALJ provided sufficient reasons for assigning less than significant weight to Dr. Morris' opinion.

Finally, plaintiff contends that the ALJ erred in failing to adopt all of the mental limitations found by Dr. Armour. Plaintiff saw Dr. Armour for a psychological evaluation at the request of the state agency on October 14, 2009. (Tr. 321-32). Dr. Armour administered the MMPI-2 and indicated that plaintiff's responses suggested possible malingering. (Tr. 324). Dr. Armour diagnosed plaintiff with major depressive disorder, recurrent, moderate; posttraumatic stress disorder, chronic; physical abuse as an adult; attention deficit hyperactivity disorder inattentive type; and pain disorder associated with both psychological factors and a general medical condition. (Tr. 325). Dr. Armour assessed a GAF score of 45 to 50. (Id.). Dr. Armour expressed the opinion that plaintiff had mild to occasionally moderate impairment in the ability to understand and remember instructions; moderate impairment in the ability to sustain concentration and persistence in tasks; and moderate impairment in the ability to interact socially and adapt to her environment. (Tr. 325-26). Dr. Armour also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental), in which he expressed the opinion that plaintiff had mild restrictions in her ability to make judgments on simple work-related decisions, and interact appropriately with co-workers; and moderate restrictions in her ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, interact appropriately with supervisors, and respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 330-31).

The ALJ indicated that he was assigning great weight to the testing results of Dr. Armour. (Tr. 206). The ALJ noted that the testing results were consistent with benefit motivation and

malingering, given the other facts cited earlier. (Id.). The ALJ pointed out that plaintiff never complained of depression until 2006, and never reported incidents from her post-traumatic stress disorder until she was seen by Dr. Armour. (Id.). The ALJ stated that Dr. Armour's assessment of plaintiff's functioning relied on plaintiff's own self-serving statements, which the evidence has shown is motivated by a desire to obtain benefits. (Id.).

The ALJ provided sufficient reasons for assigning great weight to the test results of Dr. Armour while assigning less weight to the mental RFC assessment of Dr. Armour. Plaintiff points out that Dr. Armour found that plaintiff's test results were consistent with either malingering or severe psychological distress. (Tr. 324). The ALJ recognized that Dr. Armour did not find conclusively that plaintiff was malingering, but rather, suggested it as one possible interpretation of plaintiff's test results. The ALJ stated that, given the remainder of the record, including the fact that plaintiff never complained of depression until 2006, and never reported incidents from her post-traumatic stress disorder until she was seen by Dr. Armour, plaintiff's allegations were more consistent with her demonstrated motivation for secondary gain. (Tr. 206).

Further, although the ALJ did not adopt all of the limitations found by Dr. Armour, he incorporated many of Dr. Armour's findings. The ALJ incorporated Dr. Armour's findings that plaintiff had limitations in her ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, and respond appropriately to changes in a routine work setting by limiting plaintiff to carrying out simple instructions and non-detailed tasks, making simple work-related decisions, and performing repetitive work. (Tr. 201). Although Dr. Armour assessed a GAF score of 45 to 50, this finding was inconsistent with Dr. Armour's own examination and the record. Dr. Armour found that plaintiff's speech was logical and

goal-directed with no signs of loose associations, she had no difficulty in understanding the examiner's questions, her affect was appropriate, her intellect was low average to average, her long-term and short-term memory was intact, and her insight and judgment were adequate. (Tr. 324-25). As the ALJ pointed out, plaintiff never complained of depression until 2006, never reported incidents from her post-traumatic stress disorder until she was seen by Dr. Armour, and never saw a psychologist or psychiatrist before Dr. Armour. (Tr. 206).

The undersigned finds that the RFC formulated by the ALJ is supported by substantial evidence. As previously discussed, it is significant that plaintiff performed light work several years after her alleged onset date. Testing performed by Dr. Armour suggested the possibility that plaintiff was malingering. The objective medical evidence also is unsupportive of plaintiff's allegations of disabling back pain. Physical examinations plaintiff underwent consistently revealed full range of motion, full strength, a normal gait, and no motor, sensory, or reflex deficits. Objective testing revealed minimal findings. The records of Drs. Alander and Place are not supportive of a finding of disability. Plaintiff failed to establish a more restrictive residual functional capacity. Thus, the residual functional capacity assessed by the ALJ is supported by substantial evidence in the record as a whole.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

### 2.    Vocational Expert Testimony

Plaintiff also argues that the hypothetical question posed to the vocational expert did not capture the concrete consequences of plaintiff's impairment.

Testimony from a vocational expert based on a properly phrased hypothetical question

constitutes substantial evidence upon which to base an award or denial of Social Security benefits. See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001). In order to constitute substantial evidence upon which to base a denial of benefits, the testimony of a vocational expert must be in response to a hypothetical question which "captures the concrete consequences of the claimant's deficiencies." Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008). See also Swope v. Barnhart, 436 F.3d 1023, 1025 (8th Cir. 2006). "If a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998).

Plaintiff first contends that the ALJ failed to make explicit findings as to the mental demands of plaintiff's past work. Plaintiff argues that the conclusion that plaintiff would be capable of past work prior to September 22, 2006 was, therefore, inadequate. The ALJ, however, found that plaintiff did not have any mental limitations until after September 22, 2006. As such, plaintiff's claim lacks merit.

Plaintiff also argues that she could not perform the jobs identified by the vocational expert because they had a reasoning level of three. As defendant points out, however, the Eighth Circuit has rejected this argument. See Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007) (reasoning level of three consistent with unskilled work and not "complex"). See also Birlew v. Astrue, 4:07CV01231FRB, 2008 WL 2967108 (E.D. Mo. July 31, 2008) ("The Eighth Circuit has held that reasoning level three is consistent with limitations to simple, repetitive and routine tasks").

Finally, plaintiff argues that the hypothetical question posed to the vocational expert did not capture the concrete consequences of plaintiff's impairment because it was based upon a flawed

residual functional capacity. The undersigned has found that the residual functional capacity formulated by the ALJ was supported by substantial evidence. The hypothetical question posed to the ALJ was based on this residual functional capacity. As such, the vocational expert's response constitutes substantial evidence to support a conclusion of no disability.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying

plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act be **affirmed**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this  31st  day of October, 2011.


_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE